IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| DENNIS R. RYNO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 6:20-cv-03378-MDH |
| | ) |
| CITY OF WAYNESVILLE, et al., | ) |
| | ) |
| | ) |
| Defendants. | ) |

## ORDER

Before the Court is Defendants Daniel Cordova's, Victor Weir's, and John Meir's Motion for Summary Judgment on Plaintiff's Amended Complaint. (Doc. 64). For the reasons set forth herein, the Motion for Summary Judgment is **GRANTED** in its entirety.

## BACKGROUND

Plaintiff Dennis Ryno was a resident of Plato, Missouri at all times relevant to this case. Defendant Daniel Cordova is and was the Chief of the Waynesville Police Department (WPD) at all times relevant to this case. Defendant Victor Weird was an officer of the WPD at all times relevant to this case. Defendant John Meir was an officer of the Waynesville Police Department at all times relevant to this case.

On August 15, 2012, Officer Weir was dispatched to the Shannon Valley apartment complex based on a report by the property manager that a "suspicious person" was lurking around. Officer Weir made contact with the alleged "suspicious person," who identified himself as Dennis Ryno ("Ryno" or "Plaintiff") who said he was at the apartment complex because there was a married man in the apartment of his girlfriend, Crystal Aynsley, so he was taking pictures of the

1

man's truck. Ryno was then "trespassed" from the property by the management, which Ryno took to mean he was not to come on that property.

Aynsley gave the WPD a written statement about the incident and alleged in it that she had notified her landlord on August 12, 2012, that Ryno was not welcome at her apartment due to an argument they had "that lasted for hours." WPD Officer Hazel stated in his report of the incident that Aynsley received text messages from Ryno later that evening stating, in part, that he was trying to keep her from making a mistake, that these sorts of things tend to "blow up on a girl" and that she needed to tie up loose ends so it wouldn't "blow up" on her.

### A. Harassment Case and Order of Protection

On May 18, 2013, a friend of Aynsley's, Larissa Dodd, reported to WPD Officers that Ryno had been parked near Dodd's residence and staring at her. She reported that it was the second time Ryno had been near her residence "for no apparent reason." On May 18, 2013, Aynsley also spoke with WPD officers and alleged that Ryno was given a no contact order with her on Ft. Leonard Wood, that Ryno had continually driven by her residence since August, left notes on her vehicle, been in the same places as her, and harassed her.

On May 20th, 2013, Aynsley petitioned for an order of protection against Ryno. On May 21, 2013, Aynsley provided WPD Officer Hazel with letters from Ryno and a journal which Aynsley purported to keep of all the times she saw or had contact with Ryno. On May 22, 2013, WPD Officer Joshua Hazel wrote a probable cause statement against Ryno for aggravated stalking and harassment based on Aynsley's allegations, journal entries purportedly showing Ryno's attempts to make contact with Aynsley, written correspondence from Ryno to Aynsley, and previous incidents with Aynsley and Dodd which resulted in Ryno being trespassed from multiple properties. On May 23, 2013, Aynsley contacted the WPD and alleged she received another letter

2

Case 6:20-cv-03378-MDH   Document 79   Filed 12/02/21   Page 2 of 17

in the mail from Ryno, and she provided a copy to Officer Hazel. On June 19, 2013, Aynsley reported to WPD Officer Hazel that an unknown woman left a note on her door refencing her "friend" Dennis Ryno.

On July 11th, 2013, Aynsley's was given an *ex parte* order of protection against Ryno. On July 24, 2013, Aynsley reported to WPD Officer Hazel that Ryno had been following and watching her and her friends that day as they went to a couple businesses in Waynesville. After the July 24th, 2013, incident, Aynsley's friends, William "Evert" Green and Kathy Green, also provided written statements to the WPD saying they thought Ryno was stalking or following Aynsley. In November 2013, Ryno was criminally charged with stalking and harassment of Aynsley.

On February 27, 2014, a Full Order of Protection was issued against Ryno in the Circuit Court of Pulaski County based on the petition by Aynsley, and the Order was to remain effective until February 26, 2015. The terms of the Full Order of Protection included that Ryno "not…molest, stalk, or disturb the peace of [Aynsley]" and that he not "harass, stalk or threaten [Aynsley]…or engage in other conduct that would place [Aynsley] in reasonable fear of bodily injury[.]" On March 24, 2014, Ryno pled guilty to harassment of Aynsley and received a suspended imposition of sentence with two years of supervised probation. One of the conditions of Ryno's probation was that he "submit to searches of person, place & residence at request of P.O. [probation officer] or L.E.O. [law enforcement officer]."

On or about September 29, 2014, Aynsley and Mia Tuimato submitted written statements to the WPD alleging that on September 25, 2014, they went to the Rocky Top Pet Store where Aynsley soon saw Ryno in a nearby parking lot, that Ryno drove behind them as they left and traveled on Highway 66 toward Swedeborg Road, and that shortly thereafter they went to

McDonalds, where Ryno soon showed up also. On or about September 29, 2014, Aynsley's landlord, Yvette Spencer, submitted a written statement to the WPD alleging that she had seen a man in a gray vehicle "leaving the area of the Shannon Valley Apartments" on September 27, 2014, that she had seen the same man driving around the complex on several occasions, that she saw him driving slowly through the parking lot of the complex again on September 28, 2014, and that she believed this to be the same man Aynsley told her about against whom Aynsley allegedly had "a claim of stalking."

On or about October 5, 2014, WPD Officer Prock wrote a probable cause statement alleging Ryno committed a violation under RSMo. 455.085, pertaining to violation of orders of protection, based on the allegations and written statements of Aynsley, Mia Tuimato, and Yvette Spencer. On October 18, 2014, WPD Officer Shaffer was dispatched to the Shannon Valley Apartment complex where Yvette Spencer provided a statement saying she had seen a man matching Ryno's description drive slowly through the apartment parking lot that same day. WPD Officer Shaffer spoke with Aynsley who said she had not seen Ryno on that date, but that she frequently observed him driving on Highland Woods near the apartment complex's mailbox location.

B. Surveillance

As of October 2014, Ryno was still on supervised probation as a condition of his SIS, and the Full Order of Protection against him was still in effect. Aynsley told the WPD that she was in fear for her life and the safety of herself and her friend. WPD Officer Meir's understanding was that Aynsley feared Ryno was following her all the time. Prior to October 23, 2015, Cordova looked in the WPD's computer system and saw the reports other WPD officers had previously done regarding Ryno. Between October 23, 2014, and October 30, 2014, the WPD conducted

surveillance of Ryno, including Chief Cordova and Officers Weir and Meir. Cordova, Meir, and Weir knew about Aynsley's Order of Protection against Ryno during the surveillance.

On October 23, 2014, between 4:30 pm and 4:45 pm, Cordova and Weir saw Ryno parked in a parking lot next to Kum & Go on Ichord Ave. Aynsley said that was on the route she usually took home between 4:00 pm and 4:45 pm every day. Later that day, Cordova was positioned near the mailboxes of Aynsley's apartment complex when he saw a vehicle he reasonably believed to be Ryno's drive by on Broadway Street; Aynsley had expressed she thought Ryno was intentionally driving down the street to bother her.

On October 24, 2014, Cordova and Meir saw a vehicle they reasonably believed to be Ryno's pass down Broadway Street past Aynsley's area of residence. Aynsley then left her apartment, drove to Price Cutter to get coffee from Starbucks, and then returned to her apartment; Cordova and Meir positioned themselves in the Price Cutter parking lot to see if Ryno would follow Aynsley to the area but they did not see him at that time. Later, Aynsley left her apartment again and traveled on Route 66, at which time she told Cordova Ryno passed her in his vehicle and that Ryno turned his vehicle around and followed her into the Casey's gas station parking lot. When Cordova and Meir drove by Casey's gas station, they saw Ryno at the gas pumps and Cordova reasonably believed Ryno was staring in Aynsley's direction. Ryno confirms he was at Casey's gas station on October 24, 2014, that he saw Aynsley's truck there, and he cannot say for sure who got there first. A while later, Cordova and Meir again saw a vehicle they believed to be Ryno's drive down Broadway in the area of Aynsley's residence at a slow pace.

On October 27, 2014, Officer Weir conducted surveillance as Aynsley drove to Price Cutter, where Officer Weir witnessed Ryno's vehicle cross behind Aynsley's truck; Aynsley reported to Officer Weir that she also saw Ryno drive by on her way into Price Cutter. After

5

leaving Price Cutter, Aynsley drove to a restaurant, Paradise Pit, and she informed Officer Weir she saw Ryno drive by the restaurant on Ichord Avenue. Weir testified that he reasonably believed these incidents indicated Ryno was following Aynsley. Officer Weir later saw Ryno drive on Broadway Avenue, toward Highland Woods, which was the direction of Aynsley's residence, although he lost sight of Ryno and did not see Ryno again when he checked the Highland Woods area.

On October 28, 2014, Aynsley told Officer Weir she had gone to eat at Paradise Pit with her friend, Kevin Phillips, and that Ryno had driven by 5 times. Aynsley and Phillips submitted written statements about seeing Ryno near the Price Cutter parking lot on October 28, 2014, claiming he opened his car door and stared at them, and that Ryno drove down Ichord multiple times while they were sitting outside at Paradise Pit. Ryno saw Aynsley and Phillips outside Price Cutter on October 28, 2014, noticing that they held hands as they walked into the store, and he believed Aynsley wanted to make sure he saw her holding hands with Phillips.

On October 30, 2014, Cordova and Meir positioned themselves in an unmarked vehicle at a building adjacent to Aynsley's apartment complex and Aynsley told Cordova she would invite her friend, Kevin Phillips, to join her for coffee. Aynsley drove from her apartment to Phillips' house at 104 Summit Pass Road and parked her truck in his driveway, after which Aynsley and Phillips left the house in Phillips' car. Cordova and Meir followed Aynsley and Phillips as they turned on Elm Street and passed Ryno driving the other direction. When Aynsley saw Ryno pass them on Elm Street, she "freaked out."

Ryno turned his car around and began traveling the same direction as the WPD vehicle and the Phillips vehicle. Aynsley and Phillips drove to Price Cutter and went inside as Chief Cordova and Officer Meir stayed parked in the parking lot. Ryno eventually parked his vehicle

in an adjoining parking lot approximately 200 feet from Phillips' vehicle. Aynsley and Phillips returned to Phillips' car and after a short time they left and went to Paradise Pit. Ryno remained in the area around where he had parked for a while and then left and traveled north on Ichord Avenue and turned east on Route 66.

Cordova and Meir drove to the area of Summit Pass; while they were there, Ryno drove past them on Summit Pass headed in the direction of Phillips' house where Aynsley had parked her truck earlier, so they turned around to follow. As Ryno drove on Summit Pass, he got close enough to the truck parked in the driveway of 104 Summit Pass to see that it looked like Aynsley's truck, that it appeared to have a Texas license plate. Summit Pass is a dead-end street. Ryno put his car in reverse and backed into the driveway of 102 Summit Pass, the residence next door to Phillips' house. Officer Meir pulled up in his vehicle and blocked Ryno's car in the driveway of 102 Summit Pass.

C. **Arrest**

When Chief Cordova asked Ryno why he had been right next to Aynsley's vehicle, Ryno stated he did not know it was Aynsley's vehicle and he could not see well without his glasses. When Cordova asked Ryno "Do you have any friends down this street?" Ryno stated, "I had a person who was following me earlier and I turned off and then they went down this direction….". Ryno knew Phillips lived somewhere on Summit Pass but did not know anyone else who lived on Summit Pass.

Ryno filed a petition for a protection order against Aynsley in February 2014, but no protection order was issued as of October 2014. Prior to October 30, 2014, Ryno never made a report directly to the WPD that Aynsley was supposedly following or stalking him. Phillips and Aynsley submitted written statements about the events of October 30, 2014, leading up to Ryno's

arrest. Plaintiff believes Aynsley lied to the WPD officers and that they believed her. Chief Cordova testified that the totality of the circumstances led him to believe he had probable cause to arrest Ryno.

Cordova knew more about the situation than Meir did and had more information on the case because of other officers that were talking with him and dealing with him, so Meir went by everything that Cordova directed. Meir was not presented with all the facts that Cordova knew at the time. At the time, Meir did not think the arrest was unreasonable; he made the arrest in good faith, thinking that he was doing right, and doing what he was told, even if he wouldn't have done the arrest on his own. Officer Meir wrote a probable cause statement and sent it to the Pulaski County Prosecutor's Office for charges of aggravated stalking and aggravated harassment. Weir wasn't involved in the surveillance of October 30, 2014, or the arrest of the same date.

### D. Searches

An inventory search of Ryno's car turned up several items, including but not limited to: a wig with a receipt showing a purchase date of April 2014, hats, gloves, a camcorder and other recording devices, binoculars, a scanner. Other items noticed in the vehicle were rope, coveralls, surgical gloves, rolls of large black trash bags, a hatchet, a pickaxe, a shovel, a crowbar, clothes, shoes, and personal hygiene items. Ryno's car was towed from the driveway of 102 Summit Pass, but before it was impounded, Officer Weir did another search of the car and found a laptop computer, external hard drives, papers, cameras, and voice recorders.

Officer Weir obtained search warrants for Ryno's home and electronics—including a search warrant for Ryno's laptop computer—from the Circuit Court of Pulaski County. (*See* Doc. 12 at 39, Doc. 19-2, *Affidavit in Support of Search Warrant*). Weir's statement in the search

8

Case 6:20-cv-03378-MDH   Document 79   Filed 12/02/21   Page 8 of 17

warrants that Ryno followed Aynsley to Summit Pass was based on Weir's misunderstanding of the events of October 30, 2014, as they were relayed to him.

On November 2, 2021, Officer Weir spoke with Ryno's brother and sister, Terry Ryno and Pamela Hutsell. Terry Ryno told Weir that Ryno did not work outside, hunt, fish or mend fence, hasn't mowed lawn until recently, and has not fired a weapon in over 40 years. Due to Ryno's sister, Pam Hutsell, saying Ryno always wrote everything down and typed it into the computer, Weir believed that if Ryno were doing something, planning something, or had done something, it would likely be in that computer, and it could a pattern or course of conduct.

Ryno's computer was seized pursuant to a search warrant in part because Weir testified that he believed it could hold evidence of phone calls, messages, emails, and social media information. Weir reasonably believed that if Ryno had a hard drive, phone, camera, or notes in his car, there were likely to be more at his residence. While Weir did not believe he saw something that was a crime in and of itself, he testified that he reasonably believed the totality of the circumstances would lead a normal person to believe that a crime had been committed.

## STANDARD

Pursuant to Federal Rule of Civil Procedure 56, a moving party is entitled to summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *William v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). An issue is "genuine" if "'the facts and circumstances relied upon . . . attain the dignity of substantial evidence'" and create more than a suspicion. *Swanson v. Van Otterloo*, 993 F. Supp. 1224, 1231 (N.D. Iowa 1998) (quoting *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985) (internal quotations and citations omitted)). An issue is "material" if it has a "real basis" in the record and would affect the outcome of the suit. *Swanson*, 993 F. Supp. at 1230 n.8. A party

9

opposing a motion for summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial. If the other party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).

## DISCUSSION

Plaintiff maintains three causes of action against Defendants. Count I of his Amended Complaint ("Complaint") asserts a § 1983 claim against Defendants for his alleged false arrest on October 30, 2014. Count II of Plaintiff's Complaint asserts a § 1983 claim against Defendants for alleged conspiracy to cause false arrest. Count IV of Plaintiff's Complaint asserts a § 1983 claim against Defendants for alleged unreasonable search following Plaintiff's arrest.

### A. Count I

A § 1983 false arrest claim relies on a substantive Fourth Amendment right to be free from unreasonable searches and seizures. A warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts and totality of the circumstances known to the arresting officer at the time of the arrest. *Id*. Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable. *Ulrich v. Pope County*, 715 F.3d 1054, 1059 (8th Cir. 2013) (affirming dismissal where deputies had qualified immunity because arguable probable cause existed for arrest).

Plaintiff alleges he was "unreasonably seized" when he was arrested on October 30, 2014, because he argues that Defendants lacked probable cause for the arrest. However, this argument

10

lacks merit as the facts establish that Defendants had at least arguable probable cause to arrest Plaintiff based on numerous factors.

On February 27, 2014, a Full Order of Protection was issued for Aynsley against Ryno in the Circuit Court of Pulaski County. The Order was to remain effective until February 26, 2015. The terms of the Full Order of Protection included that Ryno "not…molest, stalk, or disturb the peace of [Aynsley]" and that he not "harass, stalk or threaten [Aynsley]…or engage in other conduct that would place [Aynsley] in reasonable fear of bodily injury[.]" Cordova, Meir, and Weir knew about Aynsley's Order of Protection against Ryno. After the entry of the Order of Protection on February 27, 2014, and before October 23, 2014, the WPD had received several allegations from Aynsley and others that seemed to indicate Ryno was following or stalking Aynsley in violation of the Order. Aynsley told the WPD that she was in fear for her life and the safety of herself and her friend. Meir's understanding was that Aynsley feared Ryno was following her all the time. The statute in effect at the time regarding violations of protective orders specifically provided:

> When a law enforcement officer has probable cause to believe that a party, against whom a protective order has been entered and who has notice of such order entered, has committed an act of abuse in violation of such order, the officer shall arrest the offending party-respondent whether or not the violation occurred in the presence of the arresting officer.

RSMo. § 455.085.2.

Officers are generally entitled to rely on the veracity of information supplied by the victim of a crime—in this case, Aynsley. *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010). The offenses of both harassment and stalking focus on the purpose or intent of the perpetrator to disturb the victim, so Defendants were entitled to "rely on the implications of the information known to [them] when assessing whether [Plaintiff] possessed the state of mind

required for the crime" rather than just what they personally witnessed at the time. *Royster v. Nichols*, 698 F.3d 681, 688 (8th Cir. 2012).

However, Cordova, Meir, and Weir did not rest solely on the allegations by those witnesses. Chief Cordova looked in the WPD's computer system and saw the reports other WPD officers had previously done regarding Ryno and he began conducting surveillance with Meir and Weir on October 23, 2014. On every day they did surveillance, they observed incidents which appeared to support the allegations that Ryno was following or stalking Aynsley, as detailed above.

RSMo. § 455.085.2 specifically contemplates that probable cause may exist to believe a party has violated a protective order *whether or not the violation occurred in the presence of the arresting officer*, and in such a situation, "the officer shall arrest the offending party-respondent[.]" In this case, the threshold of probable cause was met and exceeded due to the allegations of multiple witnesses and the observations of Defendants Cordova, Meir, and Weir that Ryno's conduct amounted to harassing, stalking, or disturbing Aynsley's peace.

Even if Ryno's conduct did not violate the Order of Protection, an arrest made pursuant to a mistaken belief about applicability of such an order does not preclude a finding that the officer had arguable probable cause to arrest. *Ulrich*, 715 F.3d at 1060 (affirming dismissal of unreasonable seizure claim despite officer's alleged admission that plaintiff did not "technically" violate restraining order); *Sastry v. City of Crestwood*, 2011 WL 2938163, at *12 (E.D. Mo. July 19, 2011) (unreported) (probable cause existed where officers reasonably, though mistakenly, believed an order of protection was in effect). Accordingly, Ryno's arrest was not without probable cause.

In sum, the totality of the circumstances known to Cordova and Meir on October 30, 2014, gave them sufficient probable cause to believe that a crime had been or was being committed, and

therefore Ryno's arrest was not an unreasonable seizure in violation of his Fourth Amendment rights. For the foregoing reasons, there is no genuine issue of material fact as to Count I. Cordova, Meir, and Weir[1] are entitled to judgment as a matter of law and summary judgment is granted in Defendants' favor on Count I.

### B. Count II

In Count II, Ryno purports to state a claim of conspiracy to cause false arrest or unreasonable seizure under § 1983 against Defendants Cordova, Meir, and Weir. To prove a 42 U.S.C. § 1983 conspiracy claim, Ryno is required to prove: (1) Defendants conspired to deprive him of constitutional rights; (2) at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) the overt act injured Plaintiff. *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008). "The plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *Id*; *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). Furthermore, to survive summary judgment, Plaintiff must be able to allege with particularity and specifically demonstrate material facts that the defendants reached an agreement. *Marti v. City of Maplewood*, 57 F.3d 680, 685 (8th Cir. 1995).

Plaintiff's § 1983 conspiracy claim fails as a matter of law. As discussed above, Plaintiff fails to demonstrate that he was deprived of his constitutional right to be free from unreasonable seizure. *White*, 519 F.3d at 814. Accordingly, there is no genuine issue of material fact and summary judgment in granted in favor of Defendants on Count II.

### C. Count IV

While Count IV of the Petition is titled the same as Count I, the substance of the allegations show it is actually a claim for unreasonable search, asserted under § 1983 against Defendants

---

[1] While Plaintiff alleges the claims in Count I against all defendants, Officer Weir had no involvement in Plaintiff's arrest.

Cordova, Meir, and Weir. Unreasonable search claims are analyzed under the Fourth Amendment. "Determining the reasonableness of any search involves a twofold inquiry: first, one must consider 'whether the ... action was justified at its inception,' second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985). Ryno's claim in Count IV challenges the search of his car, electronics, and home. However, the Court previously found in its Order on Defendants' motion to dismiss that Plaintiff's allegations regarding the search of his vehicle did not state a Fourth Amendment violation. (Doc. 36 at 8).

Plaintiff challenges the validity of the search warrants obtained for the search of his home and electronics in his home. Officer Weir obtained search warrants for Plaintiff's home and electronics from the Circuit Court of Pulaski County. (*See* Doc. 12 at 39, Doc. 19-2, *Affidavit in Support of Search Warrant*). All of the search warrants for Plaintiff's laptop and electronics stated that during the WPD's surveillance, WPD officers saw Ryno drive by the victim's residence multiple times, follow the victim multiple times, and sit outside of business where the victim was located multiple times. Ryno disputes that he was followed Aynsley or Phillips at any time during the surveillance. However, as discussed above, the activities witnessed and reported by the WPD officers, based on their own observations as well as reports from Aynsley, gave rise to sufficient probable cause that Ryno committed or was in the process of committing crimes.

The affidavit in support of the search warrant for Plaintiff's laptop also stated: "[Pamela Hutsell] told me that Ryno always writes everything down and then types his information into the computer. She stated Ryno has been at her residence for hours typing information into this laptop computer." Due to these statements by Ryno's sister, Weir testified that he believed that if Ryno were doing something, planning something, or had done something, it would likely be in that

14

computer. Weir testified that he also reasonably believed, based on his law enforcement training and experience, that laptops and other electronic devices could hold evidence of phone calls, messages, emails, and social media information and that stalkers often use those items to reference their stalking activities or track their victims. Accordingly, the search of Ryno's laptop and electronics was not unreasonable or without probable cause.

With regard to the search of his home, Ryno alleges that the following "false statements" were made in the search warrant for his home: (1) on October 30, 2014, Dennis Ryno was arrested for violation of an *ex parte* and stalking after he followed Crystal Aynsley to Summit Pass, (2) there is one way in and out of that area and he had no reason to be there, particularly since she had an order of protection against him, (3) the arrest was the result of an undercover operation wherein Ryno was observed stalking the victim repeatedly, and (4) Weir interviewed Ryno's brother and sister who told him Ryno does not do physical activity and does not hunt, fish or mend fence, has not fired a weapon in over 40 years, and hasn't mowed lawn until recently.

As to the first statement, Weir testified that the statement that Ryno "followed Crystal Aynsley to Summit Pass" was based on his misunderstanding when Cordova relayed to him the events of October 30, 2014. As to the second statement, Ryno admits Summit Pass was a dead-end street, which would mean it had only one way in and out. It is established that Ryno did not have a reason to be in the area of 104 or 102 Summit Pass, and the only alleged explanation he provided for being there was that he drove there to see if someone was following him, then tried to turn around. As to the third statement, based on Aynsley's allegations and what Cordova, Meir, and Weir observed, and the totality of the circumstances, Weir did believe Ryno's actions were stalking, even if going to certain places was not in and of itself a crime. Finally, as to the fourth statement, the information from Ryno's brother and sister may not have been verbatim, but it was

15

an accurate paraphrasing as evidenced by the recording of their conversation as established in Defendants' Exhibit 15-10.

The Constitution does not guarantee "that every fact recited in the warrant affidavit is necessarily correct." *Franks v. Delaware*, 438 U.S. 154, 164 (1978). Rather, the Constitution requires that "the information put forth is believed or appropriately accepted by the affiant as true." *Id*. A search warrant is valid under the Fourth Amendment if it is supported by probable cause. *United States v. Gabrio,* 295 F.3d 880, 882 (8th Cir.2002). Probable cause exists when a "practical, common-sense" inquiry that considers the totality of the circumstances set forth in the information before the issuing judge yields a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see McAtee,* 481 F.3d at 1102. Although "an informant's veracity, reliability and basis of knowledge are all highly relevant" in determining whether probable cause exists when an affidavit is based on hearsay information, they are not "entirely separate and independent requirements to be rigidly exacted in every case." *Gates,* 462 U.S. at 230, 103 S.Ct. 2317 (internal quotations omitted); *see McAtee,* 481 F.3d at 1102. An issuing judge's "determination of probable cause should be paid great deference by reviewing courts" and should be upheld if the judge had a "substantial basis for ... conclud[ing] that a search would uncover evidence of wrongdoing." *Gates,* 462 U.S. at 236, 103 S.Ct. 2317 (alteration in original) (internal quotations omitted). *United States v. Stevens*, 530 F.3d 714, 717–18 (8th Cir. 2008)

As discussed above, the Court finds as a matter of law that the search warrants in this case were supported by probable cause based on the warrant affidavit, despite its inaccuracies. If the inaccuracies were removed from the warrant affidavit, probable cause still exists for the search of Ryno's home and electronics. *Stevens*, 530 F.3d at 718 ("A search warrant is void if…the affiant

knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the warrant affidavit and the affidavit does not establish probable cause without the false statement."). Accordingly, there is no genuine issue of material fact and summary judgment is entered in Defendants' favor as to Count IV.

## CONCLUSION

For the foregoing reasons, summary judgment is granted in Defendants' favor for Counts I, II, and IV of Plaintiff's Amended Complaint, which are the only counts remaining after the Court's previous dismissal of the other counts in the Complaint. (Doc. 36). Accordingly, Defendants' Motion for Summary Judgment (Doc. 64) is **GRANTED** in its entirety.

**IT IS SO ORDERED.**

Dated: December 2, 2021  /s/ Douglas Harpool
**DOUGLAS HARPOOL**
**United States District Judge**